IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 1999 Session

## RICHARD HAROLD DEMPSEY v. SANDRA MUSCAT DEMPSEY

**Appeal from the Circuit Court for Williamson County**
**No. 97555     Henry Denmark Bell, Judge**

---

No. M1998-00972-COA-R3-CV - Filed July 21, 2000

---

This appeal involves the award of alimony and the division of one particular piece of marital property at the dissolution of a nineteen year marriage. Mr. Dempsey appeals the award of alimony *in futuro* rather than rehabilitative alimony, the amount of alimony as beyond his ability to pay, and the award of a tax refund for the year of the divorce to Ms. Dempsey. We modify the award of alimony *in futuro* to an award of rehabilitative alimony and affirm the distribution of marital property.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

James L. Curtis, Nashville, Tennessee, for the appellant, Richard Harold Dempsey.

Edward P. Silva, Franklin, Tennessee, for the appellee, Sandra Muscat Dempsey.

### OPINION

This appeal involves the award of alimony and the division of one particular piece of marital property at the dissolution of a nineteen year marriage. Mr. Dempsey ("Husband") appeals the award of alimony *in futuro* rather than rehabilitative alimony and the award of the entire tax refund to Ms. Dempsey ("Wife"). For the following reasons we affirm the trial court's order as modified.

I.

At the time of the divorce, the parties' two children were thirteen and sixteen years old. Husband, 41, was the primary breadwinner, earning between $45,000 and $65,000 depending on his overtime and bonuses. Wife, 38, did not work outside the home for most of the marriage, but had begun to work part-time in the last few years, earning between $7.00 and $8.00 per hour. Wife

testified that she would like to go to school, but couldn't afford it. Wife and the children accompanied Husband to Tennessee in 1994 when he moved from Michigan to work for Saturn. The parties purchased a four bedroom house in Franklin, valued by them at the time of trial at $190,000, but encumbered by two mortgages totaling $104,709. At the time of the divorce, the parties were living in separate parts of the marital home, but Husband planned to get an apartment after the property was divided.

The parties filed separate petitions for divorce, each alleging irreconcilable differences and inappropriate marital conduct. At trial, Wife moved to include adultery as grounds for divorce. The court consolidated the cases, heard the evidence and granted Wife a divorce on grounds of Husband's post-separation adultery. The court awarded sole custody of the children to Wife with standard visitation to Husband. The court ordered Husband to pay $780 per month as child support. The court then ordered Husband to pay Wife $700 per month as alimony *in futuro*, continuing "until the death or remarriage of Mrs. Dempsey."

The court equally divided the stock, savings bonds and vested retirement benefits accumulated during the marriage. The marital home was ordered to be retained by the parties as "tenants in common in equal shares subject to wife's right of exclusive occupancy until the parties' younger child attains the age of majority [or] wife remarries, whichever first occurs." Wife was made responsible for the first mortgage, as well as the taxes and insurance. Husband was ordered to make "such payments on the second mortgage debt as necessary to prevent foreclosure."

Husband retained his truck, valued at $9,000, and Wife retained her car, valued at $500. Husband was ordered to pay all marital debts, except the first mortgage. He was also ordered to pay $2,500 toward Wife's attorney fees. The court awarded Wife the 1997 tax refund of $3,448 "to be utilized in purchasing a substitute vehicle for Mrs. Dempsey."

II.

Husband appeals the award of alimony and the award of the entire tax refund to Wife. Our review is *de novo* and the record before us is accompanied by a presumption of correctness which we must honor unless we find that the evidence preponderates against the trial court's findings of fact. *See* Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). The trial court has wide discretion in the matters under review, alimony and the division of marital property. *See Harrington v. Harrington,* 798 S.W.2d 244, 245 (Tenn. Ct. App. 1990).

III. The Alimony Award

Husband first challenges the award of alimony *in futuro* and argues that the trial court erred in failing to consider whether Wife could be rehabilitated in light of the legislative preference for rehabilitative alimony codified in Tenn. Code Ann. § 36-5-101(d)(1) (1996). He also argues that the trial court erred in considering only Wife's need for alimony, but not his ability to pay. Wife points to Husband's fault and responds that, as the innocent spouse, she should not be left in a worse

financial position than she enjoyed during the marriage.

## A. The Type of Alimony

Tennessee law provides for three types of spousal support: (1) rehabilitative alimony, which provides modifiable, temporary support for a period of adjustment sufficient to enable a dependent spouse to become partially or totally self-sufficient; (2) periodic alimony or alimony *in futuro*, a continuing, but modifiable, support obligation to an economically disadvantaged spouse; and (3) alimony *in solido*, an unmodifiable lump sum award which may be paid over time. *See* Tenn. Code Ann. § 36-5-101(d)(1) (Supp. 1999); *see also Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997). The legislature's stated preference is for rehabilitative alimony whenever possible.[1] *See* Tenn. Code Ann. § 36-5-101(d)(1).

Our Supreme Court has addressed the statutes on alimony a number of times, most recently stating:

> In *Self,* we held that § 36-5-101 reflects an obvious legislative policy to eliminate the dependency of one ex-spouse upon the other and to relieve the parties of "impediments incident to the dissolved marriage." Accordingly, alimony *in futuro* should be awarded only when the trial court finds that "economic rehabilitation is not feasible and long-term support is necessary."

*Crabtree v. Crabtree*, 16 S.W.3d 356, 359 (Tenn. 2000) (quoting *Self v. Self*, 861 S.W.2d 360, 361 (Tenn. 1993) (citations omitted).

Thus, one task of a trial court in deciding what type of spousal support, if any, should be awarded is to determine whether rehabilitation of the economically disadvantaged spouse is feasible. The question raised in this case, however, is the proper measure of economic rehabilitation to be used in determining if the disadvantaged spouse's attainment of that level is feasible. The issue is squarely presented herein. In making his argument that Wife can be rehabilitated, Husband points

---

[1]Tenn. Code Ann. § 36-5-101(d)(1) states:

It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is relative economic disadvantage and rehabilitation is not feasible in consideration of all factors, including those set out in this subsection, the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. . . .

to the trial court's remark, "I think she certainly is not unrehabilitatable." That remark, however, must be considered in its context. At that point in the trial, the court was considering the disparity in the parties' earning capacities. The court said,

> ...where you had a disparity in income, which you've got here, assuming she stays at seven an hour, which I think for the foreseeable future you can't conclude anything else, although I think she certainly is not unrehabilitatable to get better status than that, but in any event, he's – if she makes $7.00 an hour and he makes his base and nothing else, there's still a big disparity.

The court's remark about Wife's possible rehabilitation clearly meant that he thought it was possible that Wife could earn more than she was making at the time, not that she could earn a salary comparable to Husband's. Wife, still young and having a desire to go back to school, can likely earn more than she was making at the time of the divorce. The level of her potential earnings is less clear, and there is no indication that she could be rehabilitated to earn a salary comparable to the $45,000 to $60,000 that Husband earned at the time of the divorce. Wife did not work outside the home during most of the almost nineteen year marriage, while Husband's earnings reflect his work experience gained during that time.

Consideration of the economic level to be used to determine feasibility of rehabilitation has not been squarely addressed in most instances. Instructive, however, are statements by our courts on the goals of rehabilitative support.

> The concept of rehabilitation in ordinary usage "involves the process of restoring an individual . . . to a useful and constructive place in society through some form of vocational . . . retraining or through relief, financial aid, or other reconstructive measure." Webster's Third New International Dictionary 1949 (1961). In legal parlance and in connection with alimony, rehabilitation "contemplates sums necessary to assist a divorced person in regaining a useful and constructive role in society through vocational or therapeutic training or retraining and for the further purpose of preventing financial hardship on society or individual during the rehabilitative process." Black's Law Dictionary 1157 (5th ed. 1979). Both definitions contemplate the enhancement of an individual's capacity to function independently and with economic security in society. Likewise, the statute in question expresses the General Assembly's intent that the economically disadvantaged spouse be rehabilitated whenever possible and provides guidelines for the court to consider when "determining the nature, amount, length of term, and manner of payment." **The concept of rehabilitation in the statute is the improvement of one's present and future capacity to function independently in society.**

*Isbell v. Isbell,* 816 S.W.2d 735, 738-39 (Tenn. 1991) (emphasis added). Rehabilitative alimony has also been described as providing "a temporary income during a period of adjustment and effort of the dependent spouse to become partially or totally self-sufficient." *Loria,* 952 S.W.2d at 838.

The statute establishing the legislative preference for rehabilitative support does not define rehabilitation and gives little guidance regarding the level of rehabilitation which should be considered in determining whether rehabilitation is feasible. However, the legislature has directed that "in determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to **improve such party's earning capacity to a reasonable level;**

Tenn. Code Ann. § 36-5-101(d)(1) (emphasis added).

Thus, a court should determine whether it is feasible for a disadvantaged spouse to improve his or her earning capacity to a "reasonable level." Whether that "reasonable level" is related to the standard of living prior to the divorce or to the other spouse's earning capacity is not well-settled.[2] In some cases, the courts have considered the appropriateness of alimony *in futuro* where the disadvantaged spouse was not capable of rehabilitation such that his or her earning capacity would be comparable to the other spouse's or could support a standard of living approaching that enjoyed during the marriage. For example, in *Long v. Long*, 968 S.W. 2d 292 (Tenn. Ct. App. 1997), this court affirmed the trial court's award of alimony *in futuro* on the basis of a twenty-seven year marriage, during which the husband was "building a career outside the home," the wife's lack of a college education and very limited work experience outside the home, and the wife's medical problems. *Long*, 968 S.W.2d at 294. The court further found:

> The record clearly shows that the wife is a disadvantaged spouse and that rehabilitative alimony is not feasible because of her lack of work experience and her medical problems. **It is unlikely that she will ever be able to approach the level of income which her husband is able to enjoy.** We are of the opinion that the alimony *in futuro* awarded to Ms. Long is necessary for her to continue to maintain a reasonable standard of living which is at least **somewhat comparable to that which she experienced before the breakup of her**

---

[2]By statute, courts are also directed to consider as a relevant factor the "standard of living of the parties established during the marriage." Tenn. Code Ann. §36-5-101(d)(1)(I). That factor is most often applied in determination of the amount of support, but the statute authorizes its consideration in determination of the nature of support.

> **marriage.** Thus, we reject the husband's challenge to the trial court's
> award of alimony *in futuro*.

*Id.* at 295 (emphasis added); *see also Elkins v. Elkins*, No. 03A01-9812-CH-00415, 1999 WL 1076940 at *3 (Tenn. Ct. App. Nov. 30, 1999) (perm. app. denied July 10, 2000)**.**

Analogously, our Supreme Court has directed that, "While alimony is not intended to provide a former spouse with relative financial ease, we stress that alimony should be awarded in such a way that **the spouses approach equity**." *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995) (emphasis added), *see also* Tenn. Code Ann. § 36-5-101(d)(1) (directing that the court consider the recipient spouse's economic disadvantage "relative to the other spouse").

There are also a number of cases finding rehabilitation to be feasible or not feasible without express discussion of the level of economic rehabilitation that the disadvantaged spouse was expected to achieve. *See, e.g. Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999) (rehabilitation not feasible); *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998) (rehabilitation feasible); *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995) (rehabilitation feasible); *see also* Janet L. Richards, Richards on Tennessee Family Law § 12-4(a) (Supp. 2000) (questioning whether the *Loria* meant "not qualifying for welfare" or "a comparison between the relative economic positions of the parties" when it discussed "self sufficiency" for the dependent spouse). In a recent opinion, however, the Supreme Court has addressed the topic of rehabilitative alimony and, although not addressing the specific issue under discussion, provided guidance applicable herein. In *Crabtree*, the Court vacated an award of alimony *in futuro* in conjunction with an award of rehabilitative alimony. *See Crabtree*, 16 S.W.3d at 361. In reviewing this court's ruling in the case, the Supreme Court stated:

> In this case, the Court of Appeals recognized that the award of rehabilitative alimony would assist Ms. Crabtree in realizing her full economic potential. The intermediate appellate court, however, was concerned that rehabilitative alimony would:
>
> > not place her anywhere near an equal footing with Husband nor will she be able to continue living in the manner in which she had become accustomed during this twenty-three year marriage. The award of alimony *in futuro* will further assist her in this regard and provide her with "closing in" money.
>
> The court cited *Aaron v. Aaron*, 909 S.W. 2d 408, 411 (Tenn. 1995), in support of its conclusion.
>
> We believe that the Court of Appeals' reliance on *Aaron* was misplaced. In *Aaron* this Court awarded alimony *in futuro* to a homemaker with a high school education who had never worked outside the home. This Court noted that although the award would "not put her in the same position in which she was prior to the divorce, it will

provide her with 'closing in' money; that is she will be enabled to more closely approach her former economic position." *Aaron*, 909 S.W.2d at 411. This statement, however, was intended neither to provide a new standard for awarding alimony nor to suggest that every spouse should be entitled to be placed in the same financial condition occupied prior to the divorce. *Aaron* merely acknowledged that, where rehabilitation is *not* feasible, an award of alimony *in futuro* will not always be sufficient to place a disadvantaged spouse in the financial position occupied pre-divorce.

*Id.* at 359-60.

In its primary holding in *Crabtree*, the Supreme Court held that a concurrent award of both alimony *in futuro* and rehabilitative alimony[3] is inconsistent, stressing that the trial court must make an initial award of one or the other,[4] based upon the parties' circumstances.

At the time of the decree, a trial court must necessarily find that the recipient of alimony either can be or cannot be rehabilitated although that determination is subject to later modification. Allowing concurrent awards of alimony *in futuro* and rehabilitative alimony would require a trial court to engage in an act of clairvoyance. The trial court would not only be required to anticipate the duration necessary for rehabilitation but would also be required to anticipate the future needs of a spouse who, it has been determined, can be rehabilitated.

*Id*. at 360.

While declaring that a court must at the time of the initial setting of spousal support determine if an economically disadvantaged spouse can be rehabilitated, the Court did not directly address the measure a trial court must use in making that determination (e.g., able to maintain oneself at least minimally or able to maintain a standard of living roughly comparable to the pre-divorce standard or that enjoyed by the non-disadvantaged spouse.) However, the Court's review of the feasibility of rehabilitation by Ms. Crabtree provides some insight into that question.

The Court approved the trial court's recognition that Ms. Crabtree's rehabilitation was

---

[3]The trial court awarded rehabilitative alimony in the amount of $1700 per month for five years to be followed by alimony *in futuro* in the amount of $1200 per month until the wife's death or remarriage.

[4]The court noted that a rehabilitative alimony award remains in the court's jurisdiction and can be modified "if the recipient's prospects for economic rehabilitation materially change" and noting that alimony *in futuro* may be awarded if rehabilitation is not feasible. *Crabtree*, 16 S.W.3d at 360.

feasible. Ms. Crabtree was a 43 year old college graduate who was a certified public accountant. After working for a large accounting firm for two years after graduation, she left to start a family and had worked only part-time during most of the marriage, presumably in order to devote more time to the household and the children. It was estimated that her earning capacity if she worked full-time would be between $65,000 and $100,000 annually, and the court noted that her youngest child's graduation from high school would diminish Ms. Crabtree's need to work part-time. The Court specifically noted that, "there has been no testimony that Ms. Crabtree will need further training to 'improve [her] earning capacity to a reasonable level,'" *Id.* at 360 (citing Tenn. Code Ann. §36-5-101(d)(1)(B)). Mr. Crabtree's income as a stockbroker had varied in the six years prior to divorce, with the last five years ranging from $254,437 to $417,034. The Court reversed the award of alimony *in futuro* and affirmed the award of rehabilitative alimony for five years, but increased the amount of the rehabilitative alimony to "assist Ms. Crabtree in making the transition from part-time to full-time employment before her alimony is scheduled to end." *Id*. at 361.

The trial court herein made no explicit finding as to the feasibility of Wife's rehabilitation in its award of alimony. Based upon the court's comments quoted above, however, we believe that implicit in the court's holding is a finding that rehabilitation of Wife to a level of self-sufficiency that "approaches equity" with Husband's economic position is not feasible. The trial court's failure to make a specific finding regarding that issue does not preclude our review. *See, e.g., Crabtree*, 16 S.W.3d at 360*; Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App.1992).

Wife, at thirty-eight years old, had a high school education. At the time of the divorce, the parties' two children were thirteen and sixteen years old. Wife did not work outside the home until shortly before the divorce, and then worked part-time for $7.00 to $8.00 per hour. She claimed to have no skills other than those needed in her current job in food services, but said she was a "people person" and "good on the phone." She was in good health and stated that she would like to go to school, but couldn't afford it. Her stated intent was to work full-time once school started in the fall.

Husband at forty-one years old, also had a high school education. He earned in excess of $60,000 the three years preceding the divorce. At the time of the trial, in July 1998, Husband's earnings for that year were projected at about $45,000. The decrease in salary was explained as an involuntary reduction in overtime.

As in *Aaron* and *Long,* but unlike the disadvantaged spouse in *Crabtree*, Wife's earning potential is limited by her lack of higher education and her lack of significant experience. Neither her health nor her age would prevent her from becoming more self-sufficient through either full-time work and the experience gained thereby or through further education or training. At the time of the divorce, Husband and Wife, although possessing similar educational backgrounds, had very different earning capacities because Husband had been "building a career outside the home" for nineteen years while Wife had contributed to the marriage by taking care of the household and the children. The holding in *Crabtree* indicates that this differential is not relevant to the question of the feasibility of

rehabilitation,[5] at least at the time of the initial determination of whether rehabilitation is feasible.[6]

Based upon the statutory preference for rehabilitative alimony and the manner in which the Supreme Court applied that preference in *Crabtree*, we are of the opinion that an award of rehabilitative alimony, rather than alimony *in futuro* is appropriate in this case. We cannot presume that it is not feasible that Wife, with training and/or work experience, can improve her earning capacity to a "reasonable level." Her age, health, and desire to work full-time and/or go to school are factors supporting the feasibility of rehabilitation.

As the Supreme Court noted in *Crabtree*, an award of rehabilitative alimony remains "in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of substantial and material change in circumstances." *Crabtree*, 16 S.W.3d at 359 (quoting Tenn. Code Ann. § 36-5-101(d)(2)). The Supreme Court stated, "at the time of the decree, a trial court must necessarily find that the recipient of the alimony either can be or cannot be rehabilitated **although that determination is subject to later modification**." *Id.* at 360 (emphasis added). We take this language to mean that if circumstances develop that Wife is unable during the duration of the rehabilitative alimony award to increase her earning potential to a reasonable level, the court could then revisit the issue of whether rehabilitation was, in fact, feasible. *See Loria*, 952 S.W.2d at 840.

Accordingly, the award of alimony *in futuro* is vacated, and Wife is awarded rehabilitative alimony for six years from the date of the final decree of divorce. By the end of that time, the youngest child will have attained majority, and Wife will have had time to pursue additional education and/or to establish a full-time work history. This award of rehabilitative alimony requires Wife to attempt to increase her earning potential during its duration. At the same time, however, she will also need to increase her actual earnings in order to maintain a standard of living close to that she enjoyed at the time of the divorce. As we discuss below, we recognize that the parties can not maintain two separate households on the same income they used to support one.

---

[5]The Supreme Court apparently did not consider the difference between the husband's recent income ($362,500 average over past 5 years) and the estimated potential income of the wife ($65,000 - $100,000) in determining whether Ms. Crabtree was rehabilitatable, instead stating that she was capable of improving her earning capacity to "a reasonable level." We note however, that Ms. Crabtree practiced her profession, albeit on a part-time basis, throughout her marriage.

[6]Since the statute frames the question as whether the spouse can improve his or her earning capacity to a "reasonable level," we think the parties' expectations that both would share in the financial benefits of one spouse building a career, just as both share in the benefits of other contributions to the family, are relevant to the determination of what constitutes a "reasonable" level of income.

B.

Husband also challenges the amount of the alimony award, arguing that the court considered Wife's need but did not consider his ability to pay in setting the amount. A court must consider several factors in setting the amount and manner of payment of any spousal support awarded.[7] *See* Tenn. Code Ann. § 36-5-101(d). "The real need of the spouse seeking support is the single most important factor." *Aaron*, 909 S.W.2d at 410; *see also Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989). In addition to the disadvantaged spouse's need, "courts most often consider the ability of the obligor spouse to provide support." *Aaron*, 909 S.W.2d at 410; *Cranford*, 772 S.W.2d at 50.

Wife's Income and Expense statement indicated that her monthly expenses were $2,160.53. Her monthly income from her part-time employment averaged almost $600. The court ordered child support at $780 per month. The money Wife needed to maintain the same standard of living as before the divorce was, then, approximately $780 per month. The court awarded her $700 per month as alimony. It seems clear, then, that the court considered Wife's need and her standard of living at the time of the divorce in making its award and provided alimony sufficient for her to

---

[7]The factors the court must consider in setting the alimony obligation are:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

maintain that lifestyle.[8]

Husband's Income and Expense Statement indicates that his monthly expenses, not including alimony, exceed his monthly income by $850. In other words, Husband argues that he is unable to support himself, pay child support, and pay the debts assigned to him even if he were required to pay no alimony. A review of Husband's expenses reveals his inclusion of expenses that ended shortly after the conclusion of the trial, however. His child support obligation for the older child was to end shortly after this case was appealed, and the expenses for younger child's bedroom furniture required only three more monthly payments at the time of the trial. In addition, his responsibility for the parties' join credit card debt of $800 is a temporary obligation. When those three expenses are subtracted from his total, Husband's expenses will decrease by approximately $355 per month.

Husband's expenses, with the above mentioned obligations subtracted, still exceed his stated income. However, Husband's figures are based on a gross semi-monthly income figure which calculates to $38,251 per year, in spite of the fact that his earnings statement for January through June of 1998 reflect a figure which would result in projected annual gross income of $45,487.20. Using this amount, Husband's income is understated by $600 per month.[9]

We also notice from our comparison of the parties' statements that Wife's stated monthly

---

[8]In defending the amount of the award (as well as its nature), Wife, citing the trial court's finding that "wife would not be seeking a divorce, but for husband's adultery," relies upon the principle, reaffirmed in *Long v. Long*, that an innocent spouse should not be left in a worse financial condition than that he or she had "before the opposite party's misconduct brought about the divorce." *Long*, 968 S.W.2d at 294 (quoting *Aaron*, 909 S.W.2d at 410-11) (citation omitted). To the extent that Husband was at fault in the divorce, the court has discretion to provide "closing in" money to Wife. The purpose of the award of alimony is to approach equity between the spouses, however, not to punish Husband for his post-separation adultery. *See Duncan v. Duncan*, 686 S.W.2d 568, 572 (Tenn. Ct. App. 1984); *Lancaster v. Lancaster*, 671 S.W.2d 501, 503 (Tenn. Ct. App. 1984). Our holding herein is not inconsistent with the principles espoused by Wife, especially in view of the limited resources available.

[9] In addition, the record indicates Husband's annual income exceeded $60,000 in each of the years 1995, 1996, and 1997. The decrease is attributed to the lost opportunity for overtime work. Husband will continue to receive certain performance bonuses and, in fact, received such bonuses during the first six months of the year of the divorce. Those bonuses were included in the figures used to estimate his divorce-year income at $45,000. Thus, his average gross income for the year of the divorce (as projected) and the three preceding years was more than $58,000 per year. Considering Husband's income based on the average income for those four years, as the trial court implicitly did in setting alimony, Husband's gross income on his Income and Expense Statement is understated by $19,749 ($1645 per month). We do not base our decision on an average income, but base it on the projected annual salary in the year of divorce, $45,000.

-11-

expenses for herself and the two children were $2,160 while Husband's expenses, when child support is subtracted, are $2,360. Wife's expenses include the first mortgage on the marital home in the amount of $819 per month; Husband claims rent expenses of $800 per month and testified that no suitable housing was available for less than that amount.

This case presents a situation not uncommon upon the dissolution of a marriage: two households cannot be maintained as cheaply as one. This court has previously addressed the economic situation which often results from divorce:

> Two persons living separately incur more expenses than two persons living together. Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle once the proceedings are concluded. While enabling the economically disadvantaged spouse to maintain the pre-divorce lifestyle is a laudable goal, we have realistically recognized that in most divorce cases, the courts must be satisfied with awarding "closing in money" – that is awarding the spouse sufficient funds to return as closely as is economically possible to the pre-divorce lifestyle.

*Kinard v. Kinard*, 986 S.W.2d 220, 234-35 (Tenn. Ct. App. 1998) (citations omitted).

Unfortunately, these two people cannot both live the same lifestyle separately as they did together on the same, or similar, income. Where, as here, the level of income has been reduced from that enjoyed during the marriage, the problem is exacerbated. Neither party will be able to maintain the lifestyle enjoyed before the divorce, which does not appear to have been extravagant. Both will be required to live on less than they previously had and/or to increase their income in order to maintain their pre-divorce lifestyle. Because we have felt compelled to modify the alimony award to rehabilitative alimony for a period of six years, Wife must use that six years to become more self-sufficient or increase her earning potential. Wife's statement of income and expenses does not include any expenses for further education or training, but also does not include additional income from full-time, as opposed to part-time, employment.

The trial court and this court must deal with the parties' financial situations as they are, not as we would hope them to be. Wife clearly needs support and needs an amount sufficient to enable her to increase her earning potential. Considering Husband's understating of income, the elimination of some expenses shortly after trial, and the level of Husband's expenses in comparison to those of Wife and children, we find that Husband does have the ability to pay alimony. That ability to pay, however, is limited by his income, which has been adversely affected by his employer's reduction in overtime. Having considered all of the factors established in Tenn. Code Ann. § 36-5-101(d), we are of the opinion that the award of alimony should be modified. Therefore, we award Wife rehabilitative alimony in the amount of $700 per month for twenty-four months after the final judgment awarding the divorce and $500 per month for forty-eight months thereafter.

IV. The Tax Refund

Husband also appeals the trial court's award of the entire 1997 tax refund, $3,448, to Wife. As salary earned and refunded to the parties during the marriage, the tax refund is marital property and subject to equitable division. *See* Tenn. Code Ann. § 36-4-121(b)(1)(A). Husband argues that the distribution of the tax refund was inequitable because it was achieved almost exclusively through his efforts, as Wife admitted that the refund represented as little as $100 of her funds. Husband does not dispute the remainder of the trial court's distribution of marital property.

Husband relies on *Kelly v. Kelly*, 679 S.W.2d 458 (Tenn. Ct. App. 1984) for the proposition that marital property is presumed to be equally owned until proven otherwise. *See Kelly*, 679 S.W.2d at 462. Seemingly, Husband would have the trial court consider each piece of marital property "equally owned" and consider each party's contributions to that piece of property, rather than considering the marital property as a whole when making the division of property.

The appellate court in *Kelly* did state, "in order to make an equitable distribution of jointly owned marital property, it should be presumed that ownership is equal until proven otherwise." *See Kelly*, 679 S.W.2d at 462. This case is easily distinguishable, however, because the trial court in that case, with no findings of fact to explain such an award, ordered that the husband receive 90% of the marital property. The award was vacated and remanded for further findings of fact. *See Kelly*, 679 S.W.2d at 462. At no point did the appellate court in *Kelly* direct that each piece of property be considered separately and divided in proportion to each party's contribution. While the trial court must consider all of the marital property when making the division of property, the court is not required to award each party an interest in each piece of marital property. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990). Unless the facts require otherwise, courts generally judge the fairness of a property division by the final result. *See id.* As noted above, Husband did not challenge the final result in the distribution of marital property. The one half of the tax refund which Husband claims should have been awarded to him amounts to $1,724. Comparing that figure to the total amounts distributed, we find nothing inequitable in the trial court's award.

Furthermore, we note the trial court's statement that the refund was awarded to Wife "to be used in purchasing a substitute vehicle . . ." Before the parties' marital difficulties, Wife had a new leased vehicle. Upon expiration of the lease, and after their difficulties began, Husband returned the new leased vehicle and, for $500, purchased Wife a 1984 Skylark with more than 100,000 miles on it. Husband continued to drive his $9,000 truck. Considering Wife's earlier vehicle and the vehicle Husband had at the time of trial, and considering the overall fairness of the distribution of marital property, we find no error in awarding Wife the tax refund to use in the purchase of a vehicle.

## V.

The order of the trial court is affirmed as modified. This case is remanded to the trial court for such proceedings as may be necessary. The costs of this appeal are taxed equally to the parties.


_____
PATRICIA J. COTTRELL, JUDGE